Filed 6/6/23  P. v. Thomas CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C093565 |
| Plaintiff and Respondent, | (Super. Ct. No. CR 2019-13) |
| v. | |
| BUCK MALDONADO THOMAS, | |
| Defendant and Appellant. | |

Defendant Buck Maldonado Thomas was a private softball coach who offered training and liaison services to high school students to help them secure college softball scholarships.  In 2018, a jury found defendant guilty of multiple crimes arising out of his sexual abuse of two high school girls whose families had hired him for his coaching services.  The trial court sentenced defendant to 37 years four months to life in prison.

On appeal, defendant contends:  (1) the trial court incorrectly stated the law in response to a jury question and also failed to provide a unanimity instruction; (2) the trial court erroneously admitted propensity evidence; (3) the admission of child sexual abuse

1

accommodation syndrome testimony deprived defendant of a fair trial; (4) the denial of defendant's motion for new trial was an abuse of discretion; and (5) defendant is entitled to remand for resentencing in view of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) (Stats. 2021, ch. 731, § 1.3) and Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) (Stats. 2021, ch. 441, § 1). The People concede, and we agree, that remand for resentencing is required. However, we conclude that defendant's remaining arguments lack merit, and thus we otherwise affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

*Statement of Facts*

A.      *H.L. (counts 1-6)*

H.L. played softball her "whole life." She had hoped to get a scholarship and play softball in college.

In 2018, when H.L. was 15 years old, H.L.'s softball coach suggested H.L. meet with defendant, who worked on batting with the coach's son at the time. H.L. had heard that defendant formerly coached Major League Baseball players. H.L.'s mother also was aware that defendant came highly recommended as a hitting coach. In July 2018, H.L. and her father met with defendant at a park during a softball tournament along with another teammate, M.R. Defendant told H.L. and her father that he would like to train with her. They discussed the possibility of H.L. coming to defendant's facility or defendant coming to H.L.'s home. At some point, H.L. mentioned she would like to go to a university in San Diego, and defendant said he had some connections that could help her gain admittance. In general, defendant promoted his ability to get H.L. a scholarship and assist her with the recruiting process.

After a family discussion, H.L.'s family agreed to hire defendant as a batting trainer and liaison for H.L. They paid defendant $5,000 and flew him to Sacramento to stay in a spare room in their home in West Sacramento from July 30, to August 4, 2018. Before his arrival, defendant began sending messages to H.L. over Instagram. One of

2

defendant's messages said: "Baby girl, from this day forward, you no longer need to worry. [Undisclosed phone number] is my cell, 24/7 you need me . . . [I'm] here. See you soon. Already talking to dad about me coming to stay with you a few days. You okay with that?" H.L. did not respond.

When defendant arrived at H.L.'s home, he discussed logistics for training and payment with H.L.'s family. Thereafter, defendant told H.L. that they should begin training in her room, and that her parents should not be there because she needed to be more independent. Defendant told H.L. not to wear her bra or underwear. H.L. and defendant went into her room and defendant closed the door. Once inside, they began stretching on a mat with H.L. lying on her back. Defendant sat by her legs and began rubbing the inner lips of her vagina with his finger under her clothes. As he rubbed her vagina, defendant said something like, "[Y]ou like that, huh." H.L. froze and tried not to cry. When she tried to push him with her legs, defendant, who was much larger than H.L., pulled her shorts aside and began licking her vagina. As he did so, he held H.L.'s legs down, and she was unable to get up. Defendant eventually stopped and told H.L. they were going to the mall, and that she should "wear something sexy that shows your butt." Defendant then lifted H.L.'s shirt up, exposing her breasts, and she pulled it back down. Defendant told her to stop, that they were going to get to know each other well, and she needed to trust him. H.L. shook her head and pushed her shirt back down again. Defendant stopped and left the room. H.L. eventually left the room and her mother saw that H.L. was "kind of crying." She asked H.L. what was wrong, but H.L. said nothing was wrong because she was embarrassed.

H.L. and defendant went to the mall, where he bought her shoes and candy and told H.L. that people were checking her out and looking at her "butt." When they returned home, H.L.'s mother continued to ask her what was wrong. H.L. told her that defendant touched her, but that it might have been an accident. She said it might have been an accident because she was scared and embarrassed. H.L.'s mother said she was

3

calling the police, but H.L. responded, "Please don't. I think it was just an accident," and began crying. At the time, H.L.'s mother thought that because defendant came highly recommended and had a family, perhaps it truly was an accident. She later believed she should have called the police but was "naive and dumb" at the time.

H.L.'s mother told H.L.'s father what H.L. told her, and he confronted defendant. Defendant apologized and said that they would not do any more stretching exercises. He told H.L. that he would never want her to feel uncomfortable, and that he would never do anything like that. Apart from visiting a baseball player in another town for two days, defendant remained in H.L.'s home for the week and continued to work with her. On one of those days, defendant also trained M.R. at H.L.'s house.

One night during defendant's visit, H.L. was asleep in her bed with her dog. Defendant opened her bedroom door, which woke up H.L. Defendant took a step inside, but then H.L.'s dog barked, so defendant closed the door. The following night, H.L. slept with her mother in her bedroom with the door closed. In the middle of the night, while H.L. was asleep, defendant came into her bedroom. H.L.'s mother awoke and asked what he was doing. Defendant "tried to play it off" and "just grabbed" one of H.L.'s backpacks and said he needed a backpack for his things. Then he left the room.

On defendant's final night in the house, H.L.'s mother again slept with H.L. in her room with the door shut. During the night, defendant opened the bedroom door and came into the room, up to the bed. H.L.'s mother sat up in bed, startled. Defendant said he was just wondering what time they were leaving in the morning. He then left the room.

After defendant flew home, H.L., who was normally very outgoing and social, became quiet, withdrawn, and depressed. She slowly began telling her mother details about defendant's actions. By the end of August 2018, H.L. told her mother that defendant "[l]icked his finger and touched her" and that he performed oral sex on her. H.L.'s mother said that they would call the police, but H.L. cried and said she was embarrassed and worried. H.L. was "upset, crying, broken." H.L.'s mother had to

4

comfort H.L. to mentally prepare her to file a police report, a process that was "a little bit slow." On November 30, 2018, H.L.'s mother spoke to a detective about defendant's actions. H.L.'s mother also gave the detective M.R.'s name, because she had been at their home with defendant.

B.    *M.R. (count 7—charged offense)*

M.R. began playing softball when she was eight years old. It had been M.R.'s dream to get a college softball scholarship. On August 1, 2018, when M.R. was 16 years old, she met with defendant at H.L.'s home to work on hitting. Once there, defendant tried to sell M.R. and her father on signing up for his program. Defendant said M.R.'s family should trust him because he had connections to many schools, and he had helped many people get accepted to college. He then went outside with M.R., her father, and H.L. to work on hitting. Defendant hit with H.L., sent her inside, and began hitting with M.R. After a few minutes, defendant asked her father to leave so that M.R. could feel comfortable with him. M.R.'s father went back inside.

Defendant began showing M.R. how to swing. He got behind M.R., and started "feeling around [her] body," telling her to be comfortable with it, and that he was trying to help her. He grabbed her hips, and had her sit backwards on him, which made M.R. very uncomfortable, but she "did it anyways." As she leaned backwards, defendant put his hands on her breasts under her shirt but over her bra. He told her to be comfortable, that he was just trying to loosen her up. M.R.'s father returned, and defendant stopped touching her. M.R. was unsure whether defendant's behavior had been inappropriate or if he was genuinely trying to help her. At that time, M.R. did not say anything to her father about the touching.

M.R.'s parents hired defendant to coach M.R. and paid defendant $5,000 for her to go stay at defendant's house in Arizona.

5

C.  *Defendant's uncharged sexual offenses*

    1.  *M.R.*

In September 2018, M.R. went to Arizona to stay at defendant's home for three days. The first evening in defendant's home, defendant asked M.R. to lay on the floor so he could stretch her to prepare her for the next day. He put his hand inside her pants, touched her inner thighs, and started touching around her "genital area." He touched both "inside" and "outside" her vagina. To M.R., it was a "very . . . scary thing." M.R. jumped a little bit and told him she did not want to be stretched. Defendant stopped, reassured her that he was trying to help her, and left. M.R. did not know what to do and did not know whether to call her parents.

After dinner, defendant returned to M.R.'s room. He held his "genital area" and told M.R. that she was "getting his . . . friend excited," and that "not many people can do that for him." He then grabbed her hand and made her feel his "genital area" and told her that he would be back for her later. Defendant later asked M.R. to drive to the gas station with him and told her not to bring her phone. On the way home, he said he was going to finish what he started earlier. He put his hand down her pants again, said he could "make [her] feel so good," and started rubbing her inner and outer vagina under her clothes. When they returned home, M.R. went to bed. In the middle of the night, defendant went into M.R.'s room, caressed her leg, and told her he would be training her in the morning.

The following day, they trained together for 14 hours, to the point of exhaustion for M.R. That night, defendant returned to M.R.'s room, closed the door, and had her touch him again. He told her to get on the floor and took off both of their clothes. He laid her on her stomach and pushed her down so she could not breathe and was unable to get up. He took his penis out of his pants, put it in her vagina, and had sex with her. It was very painful. Three times, defendant heard a noise in the house, jumped up, and hid behind the door. The sex lasted for about 20 to 25 minutes. The following night, after a day of training, defendant "proceeded to do the same thing he did the night before."

6

Defendant forced M.R.'s hand on his penis, pushed her to the ground, and had sex with her in the same way as the night prior. The next day, M.R. flew home and did not tell her parents what happened because she was scared, embarrassed, and defendant told her that no one would believe her and he could ruin her softball career.

In November 2018, M.R. went to Arizona again to train with defendant. The first night, defendant entered M.R.'s room, locked the deadbolt, shoved a pillow on her face to keep her quiet, and had sex with her on the floor in the same manner as before. The next day, defendant went into the bedroom where M.R. was getting ready for practice. He told her she was pretty and tried to kiss her on the mouth. Then he turned her around, took off her pants, pushed her onto the bed, and had sex with her on the bed for about five minutes. After he left, M.R.'s privates were bleeding, and she was in a lot of pain. She then went to practice with defendant, where he had her sit back on his lap for hours and do a swaying movement to hit the ball.

Late that night, defendant returned to her room, placed M.R. on the floor, took off her pants, and had sex with her on the floor. Defendant did this each night M.R. stayed at his house, except for the third night, where he came in her room twice to have sex. She was afraid to scream because she did not trust anyone in the house.

After M.R. returned home, she did not tell her parents what happened because she was scared, embarrassed, and mortified about the situation. She felt that defendant's actions had threatened her softball career, something she had achieved by working so hard. She "didn't want to risk everything in [her] life" by reporting defendant. She also thought people would not believe her because defendant was "such an upstanding coach." Eventually, a detective called M.R.'s mother because H.L. had come forward. M.R. told her mother that defendant had touched her and had sex with her "in every way possible."

2.    *S.W.*

S.W. trained with defendant once a month at defendant's house in Arizona. In September 2017, when S.W. was 18 years old, defendant told her they needed to go into

his house during a training session.  Once inside, defendant said he needed to check to see if she was "[Division] I material."  He began touching her breasts over her bra.  Then he unzipped her pants and started touching her under her underwear, rubbing her vagina.  He did so for about five minutes.  S.W. was shocked, scared, and felt horrible.

3.    *K.S.*

In 2016, defendant trained K.S. for softball for approximately five months when K.S. was 17 years old.  After hard workouts, defendant would tell her that they needed to rub out her muscles.  Then, he would rub up her legs and into her vagina, usually rubbing it with his thumb.  He would touch the inside and outside of her vagina.  He would also say inappropriate things, such as telling her that her vagina was cute.  Defendant also massaged her breasts both over and under her shirt and sports bra.

Once, defendant took her upstairs to his bedroom and told her to take off all her clothes.  After she did so, defendant gave her a full body massage, rubbing her vagina and breasts with his hands.  Another time, defendant kissed her neck and gave her a hickey.  K.S. thought defendant's behavior was "really weird" but had never had a trainer before, and defendant told her that the massages were a "normal thing."  She trusted defendant to not take advantage of her, because he had a father-like role in her life.

4.    *D.R.*

In 2007 or 2008, when D.R. was 16 years old, she received batting lessons from defendant. Defendant began sending D.R. text messages, asking her whether she was a virgin, and using graphic phrases and terms to describe her sex life and the sex lives of other boys and girls that he worked with.  Defendant would have D.R. lay on her back to stretch, with her leg over his shoulder.  When he did so, he told D.R. to wear loose fitting shorts.  Then he would use his hands to rub the inside of her thigh and against her groin.  Some days, defendant's fingers would rub around her vagina and go inside her vagina, subtly and quickly.  Defendant would also rub under the bottom of her shorts to rub where the thigh "meets the butt area."  He also would massage her breasts under her bra.

8

D.R. did not say anything about defendant's touching because defendant was training her brother and she was worried it would ruin her brother's career, and because defendant was dating her sister at the time.

D.  *Dr. Blake Carmichael*

Dr. Carmichael, a licensed psychologist, testified for the prosecution as an expert on child sexual abuse accommodation syndrome (CSAAS), child psychology, and the psychology of child sexual abuse victims. He explained that CSAAS is an educational tool to help dispel misconceptions people have regarding child sexual abuse. Dr. Carmichael identified and described the five components of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, unconvincing, and conflicted disclosure; and (5) retraction or recanting. Specifically, he explained that children may hesitate to report because they are afraid of being abandoned or hurt, feel responsible for what occurred, or feel judged. He also explained that a child might feel helpless or otherwise feel entrapped in the relationship if the perpetrator is an authority figure. Dr. Carmichael testified that a victim of childhood sexual abuse might have a flat affect, or show no outward displays of fear, shame, or distress. And, he described why children may give inconsistent accounts and might retract their claims due to family pressure or a close relationship with the abuser.

Dr. Carmichael did not know any of the specific details of the alleged sex acts committed by defendant. He stated that he was not there to provide an opinion about whether anyone in the case, or otherwise, was sexually abused.

E.  *Defendant*

Defendant testified on his own behalf. During the summer of 2018, defendant ran a business called "The Hitting Guy," in which he offered hitting instruction and a college placement program. He recalled meeting H.L. and M.R. in July 2018, when defendant was 41 years old. On July 30, 2008, defendant flew to Sacramento to stay in H.L.'s home

9

and train her.  Before defendant's trip to Sacramento, he communicated with H.L. over Instagram to "build rapport and give her some confidence."

During his time at H.L.'s home, defendant went into H.L.'s bedroom to stretch H.L.  He denied asking her to take off her bra and underwear prior to stretching and denied that the door was closed.  According to defendant, when he stretched H.L., he noticed that her back was in pain.  He stopped stretching her, told H.L.'s parents about the suspected injury, and contacted a doctor.  Defendant then went outside to take a phone call.  H.L.'s father came outside thereafter and told defendant that H.L. felt uncomfortable while they had stretched.  Defendant was "absolutely shocked," thought that perhaps her back had hurt, and apologized to the family.  He testified that he did not touch or lick H.L.'s vagina and did not lift up her shirt.  He also denied walking into H.L.'s bedroom during the first, second, and last night he stayed over.

Defendant acknowledged meeting with M.R. at H.L.'s home but said he did not make any sexual comments to her or grab her breasts that day.  He also testified that M.R. stayed with him twice in Arizona, but he never touched M.R.'s vagina, never had sex or oral sex with M.R., and never stretched with her on either trip.  Defendant further denied touching D.R., K.S., or S.W. inappropriately.

F.      *Dr. Randall Kolin*

Dr. Kolin, a psychologist, testified as a defense expert on child sexual abuse as it relates to the psychology of children, CSAAS, and suggestive interviewing.  He explained that CSAAS is a theory proposed by a clinician in 1983 which Dr. Kolin viewed as an anecdotal description of a pattern of behaviors rather than the result of a scientific, peer-reviewed study. Dr. Kolin said that CSAAS is not supported in the scientific community, nor by the American Psychological Association or the American Psychiatric Association.

10

*Jury Verdict and Sentencing*

The jury found defendant guilty of five counts against H.L.: first degree burglary by means of unlawfully entering an inhabited child's bedroom with the intent to violate section 289 (Pen. Code, § 459—counts 1 & 6);[1] lewd and lascivious acts upon a child 14 or 15 years of age (§ 288, subd. (c)(1)—count 2); forcible sexual penetration of a minor (§ 289, subd. (a)(1)(C)—count 3); and forcible oral copulation of a minor. (Former § 288a, subd. (c)(2)(C)—count 4.) For count 3, the jury found true that defendant committed the crime during the commission of first degree burglary. (§ 667.61, subd. (a).) The jury further found defendant guilty of sexual battery against M.R. (§ 243.4, subd. (c)—count 7.)

On December 16, 2020, the trial court sentenced defendant to an aggregate term of 37 years 4 months to life, comprised of 25 years to life on count 3, plus the upper term of 10 years consecutive on count 4, 16 months consecutive on count 6 (one-third the middle term), and one year consecutive on count 7 (one-third the middle term). The trial court imposed a concurrent upper term of six years on count 1, which it stayed per section 654, and a concurrent term of three years on count 2. The trial court recalled the sentence, but then reimposed the original sentence on February 2, 2021.

DISCUSSION

I

*Jury Question and Lack of Unanimity Instruction (Counts 2 & 3)*

Defendant first contends the trial court erred by responding to a jury question with an erroneous statement of law and also failed to give a unanimity instruction. Defendant acknowledges that defense counsel did not object to the trial court's response to the jury question, but contends that if the argument is forfeited, his counsel was ineffective for

---

[1]     Undesignated statutory references are to the Penal Code.

failing to object. We conclude that while defense counsel did forfeit his challenge to the jury response, counsel was not ineffective because the trial court's response was not erroneous. We further conclude that the trial court did not err by declining to issue a unanimity instruction.

A.    *Additional procedural background*

The jury's question arose from apparent confusion over count 2 (lewd or lascivious acts against a 14 or 15 year old) and count 3 (sexual penetration by force).

For count 2, the jury was instructed that to find defendant guilty of lewd and lascivious acts, it had to find that defendant "willfully touched any part of a child's body either on the bare skin or through the clothing" and did so "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child." During closing argument, the prosecutor said that count 2 applied to H.L. and explained that count 2 "is when he is pulling up the shirt in her bedroom exposing her breasts, telling her they've got to trust each other, stuff like that."

For count 3, the jury was instructed that to find defendant guilty of sexual penetration by force, it had to find that defendant "committed an act of sexual penetration with another person" and that "the penetration was accomplished by using a foreign object." The instruction further stated that sexual penetration "refers to penetration of the labia majora, not the vagina." The prosecutor explained during closing argument that count 3 was sexual penetration of H.L., and said with respect to count 3, "H.L. did tell you that he held her down and stuck his fingers in her vagina when they were in her room."

During deliberations, the jury sent the following note: "Can Count 2 & Count 3 apply to the same incident? [¶] [S]tated differently [¶] if we were to be inclined toward guilt on Count 3, would Count 2 be automatically included?" The trial court invited thoughts from both sides regarding a response. The prosecutor suggested referring the jury to instruction CALCRIM No. 3515, which says that each of the counts charged is a

12

separate crime that must be considered separately. Defense counsel agreed that such a response would be appropriate.

The trial court then read aloud the draft response it had already prepared. The draft stated: "Please see Jury Instruction 3515. Each count is a separate crime and you must consider each count separately. [¶] [Count] 2 is not automatically included in [count] 3. [¶] [Count] 2 and [Count] 3 can apply to the same incident. The People have the burden of proving each element of each count beyond a reasonable doubt." Both attorneys agreed with the trial court's response, and it was submitted to the jury.

After the noon recess, the prosecutor expressed concerns about the answer the trial court had given to the jury's question. Specifically, she took issue with the statement that both counts "can apply to the same incident." When she initially agreed to the response, she interpreted "incident" to generally mean "the incident in the bedroom," but upon further reflection, she believed the jury could wrongly interpret "incident" to mean conduct. Thus, the prosecutor believed their response erroneously told the jury it could convict on count 3 based on the conduct of count 2. She explained, "I elected that Count 2 referred to only of the lifting of the shirt and Count 3 was only for the sexual penetration, and I think we need to make that clear for them . . . you know, in another case, sure, the conduct of [section] 288[, subdivision] (c) of course can also apply to a [section] 289, but that's not what I alleged in this case so I don't want them thinking lifting of a shirt is qualifying for a [section] 289 or vice versa."

Defense counsel said it did not understand that the People elected that lifting the shirt to apply to count 2, and that if the People thought that more than one act could constitute a section 288, subdivision (a) violation, then the jury should have been instructed on unanimity. However, defense counsel maintained that the response was "appropriate" and "answered their question," though she repeated that a unanimity instruction was needed if the People were "assert[ing] an election."

13

The trial court rejoined that it also did not recall the People specifically identifying the lifting of the shirt as the basis for count 2, though the court acknowledged it could have missed the election. The prosecutor confirmed that she made that election at closing, and reiterated: "I'm very concerned that the jury thinks that [section] 289, the conduct of a [section] 288[, subdivision] (c) qualifies as a [section] 289. I think we need to tell them they're separate acts." Defense counsel responded, "I feel like that's what Your Honor told them in the answer." The trial court concluded that it was not inclined to amend its response to the jury. The prosecutor then asked if she could submit new verdict forms for counts 2 and 3, designating count 2 as lifting the shirt. Defense counsel objected to the proposal, and the trial court declined to issue new verdict forms at such a late stage.

B.     *Response to jury question*

1.     *Forfeiture*

As an initial matter, we find that defendant forfeited his claim that the trial court's response to the jury question was erroneous. "When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal. [Citations.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 802.) Here, as we will explain, the trial court gave a generally correct and pertinent statement of law in response to the jury's question. Defense counsel not only failed to object to the trial court's response, but insisted, over the prosecution's objection, that it was accurate. Thus, this argument was forfeited.

However, we still may assess the merits of defendant's claim through the lens of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, defendant must prove (1) that trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing

14

professional norms, and (2) that the deficiency resulted in prejudice to defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) As we conclude here that the trial court's response to the question was not erroneous, we find counsel was not ineffective for failing to object. (*People v. Price* (1991) 1 Cal.4th 324, 387 [defense counsel is not required to make frivolous objections].)

### 2. *Applicable legal principles*

The trial court is required to " 'instruct[] the jury on all the general principles of law raised by the evidence which are necessary for the jury's proper understanding of the case.' " (*People v. Ramirez* (2021) 10 Cal.5th 983, 1035.) Additionally, the trial court must provide deliberating jurors with information when those jurors desire to be informed on any point of law arising in the case. (§ 1138.) Thus, the trial court is "under a general obligation to 'clear up any instructional confusion expressed by the jury,' but '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Dykes, supra*, 46 Cal.4th at p. 802.) To assess whether the trial court correctly instructed the jury, " 'the question is whether there is a "reasonable likelihood" that the jury understood the charge as the defendant asserts. [Citations.] "In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly." ' " (*People v. Doane* (2021) 66 Cal.App.5th 965, 980-981.)

### 3. *Analysis*

Here, the jury asked if counts 2 and 3 "appl[ied] to the same incident," or stated differently, if they were "inclined toward guilt on Count 3, would Count 2 be automatically included?" The trial court answered the question directly, and correctly, by stating that "[count] 2 is not automatically included in [count] 3." It further made clear that each count was a separate crime to be considered separately, by stating this plainly

and by referring the jury to CALCRIM No. 3515, which provides that "[e]ach of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one except for the lesser-included offenses . . . addressed in instruction 3517." CALCRIM No. 3517, in turn, defined lesser included offenses for the jury, and specifically listed the lesser included offenses in the case. The list did *not* include count 2 as a lesser included offense for count 3, again reiterating that count 2 was not automatically included in count 3.

Based on these instructions, the jury was reasonably likely to understand that a finding of guilt for count 3 did not mandate finding defendant guilty on count 2, or vice versa. The trial court's statement that counts 2 and 3 "can apply to the same incident," though perhaps inartfully crafted, does not negate the court's clear instructions that counts 2 and 3 were separate crimes that must be separately proven, and that count 2 is not automatically included in count 3. Moreover, the statement can be reconciled with the rest of the trial court's response, just as the prosecutor first understood it. Within the context of the entire response, and the prosecutor's explanation of the crimes during closing argument, the jury could only interpret "incident" to mean defendant's actions in H.L.'s bedroom that afternoon, rather than any single isolated act by defendant.

Accordingly, the trial court's response was not erroneous and defense counsel was not ineffective for failing to object.

C. *Unanimity instruction*

Defendant further contends that the response to the jury question triggered the need for a unanimity instruction, and that the lack of such instruction deprived him of a fair trial.[2] Again, we disagree.

---

[2] Defense counsel briefly requested a unanimity instruction in light of the prosecutor's concerns following the response to the jury question, but did not press the issue. Regardless, we may consider the issue on appeal, because the trial court has a sua

16

"Based on the principle that a defendant in a criminal jury trial has the right to a unanimous verdict, 'cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.' [Citation.] 'This requirement of unanimity as to the criminal act "is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed." ' [Citation.]" (*People v. Brugman* (2021) 62 Cal.App.5th 608, 627.) "A unanimity requirement generally applies to acts that could have been charged as separate offenses, and a unanimity instruction must be given ' "only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." ' " (*People v. Seaton* (2001) 26 Cal.4th 598, 671.)

However, no unanimity concerns are implicated here. A unanimity instruction is only needed " 'when conviction on a *single count* could be based on *two or more* discrete criminal events.' " (*People v. Russo, supra*, 25 Cal.4th at p. 1135, italics added.) Here, the jury was presented with *two* separate acts—(1) lifting the shirt and (2) vaginal penetration—and *two* separate counts (counts 2 & 3). Thus, the trial court had no duty to instruct on unanimity because the acts at issue were charged as separate counts. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 92 ["A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses"].)

Further, even if the trial court's response to the jury had created a potential unanimity issue, a unanimity instruction is unnecessary where the prosecutor elects the specific conduct that forms the basis for each count. "When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific

---

sponte duty to issue a unanimity instruction where one is required. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

17

act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act. [Citation.]" (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.) " 'The prosecution can make an election by "tying each specific count to specific criminal acts elicited from the victims' testimony"—typically in opening statement and/or closing argument. [Citations.] . . . [Citation.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.' [Citation.]" (*People v. Brugman, supra*, 62 Cal.App.5th at p. 627.)

Here, the prosecutor expressly stated in closing that count 2 was "when he is pulling up the shirt in her bedroom, exposing her breasts," whereas count 3 was when defendant "held her down and stuck his fingers in her vagina." The fact that the trial court and defense counsel did not (apparently) hear the prosecutor make the election does not render the election inadequate where, as here, the prosecutor's closing statement clearly assigned specific conduct to each count. Moreover, the trial court's response to the jury reiterated the prosecutor's election as to acts separately assigned for each charged offense.

Based on the foregoing, the trial court did not err by declining to issue a unanimity instruction.

II

*Uncharged Acts*

Defendant next contends that the trial court abused its discretion by admitting evidence of uncharged acts alleged by four women under Evidence Code sections 1108 and 352. We find no abuse of discretion.

A.    *Additional procedural background*

Before trial, the People moved under Evidence Code section 1108 to admit evidence of 10 prior sex offenses allegedly committed by defendant. Defendant opposed the motion, arguing the evidence would be time consuming and the danger of undue

18

prejudice substantially outweighed its probative value. At the hearing, the trial court reviewed the various incidents, weighed the competing factors, and ultimately granted the prosecutor's motion as to acts alleged by five witnesses, thereby excluding the remaining five.[3]

Several weeks later, the People sought to permit T.D. and T.S. to testify remotely through videoconferencing, and further stated that V.W. did not want to be involved with the case. The trial court denied the request. Thus, V.W., T.D., and T.S. were rendered unable (or were simply unwilling) to testify. Consequently, the People sought to substitute in K.S. as a witness attesting to uncharged acts. The trial court noted that K.S.'s allegations were similar to, and occurred within the same time frame as, those made by V.W. Thus, the trial court admitted K.S.'s testimony because it was probative, not substantially outweighed by undue prejudice, and would not unduly consume time, given that she would effectively replace another witness's testimony.

The People also filed a motion in limine under Evidence Code sections 1108 and 1101, subdivision (b) to admit evidence of several uncharged rapes that defendant had committed against M.R. At the hearing, defense counsel incorporated her previous objections made under Evidence Code section 1108, but alternatively argued that if M.R.'s testimony was admitted, the word "rape" should be excluded. The trial court found the probative value of M.R.'s rapes outweighed possible prejudice, and the evidence was also relevant for purposes of motive and intent under Evidence Code section 1101. It therefore admitted the testimony under Evidence Code sections 1108, 1101, and 352, but ruled that the word "rape" could not be used at trial. Ultimately, four individuals testified regarding uncharged acts: M.R., S.W., K.S., and D.R.

---

**3** The trial court authorized the prosecutor to offer the testimony of D.R., T.S., T.D., V.W., and S.W. into evidence.

B.    *Applicable legal principles*

Where a defendant is accused of a sexual offense, Evidence Code section 1108 permits evidence of other sexual offenses so long as it is not inadmissible under Evidence Code section 352. (Evid. Code, § 1108; *People v. Cordova* (2015) 62 Cal.4th 104, 132.) As such, the probative value of the evidence cannot be "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

In considering prejudice, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.) We review a challenge to the admission of evidence under Evidence Code section 1108 for abuse of discretion. (*People v. Cordova, supra*, 62 Cal.4th at p. 132.) A trial court abuses its discretion when its ruling "falls outside the bounds of reason." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.)

C.    *Analysis*

Here, the trial court was well within its discretion to admit evidence of the uncharged acts. The evidence was highly probative, as the witnesses' testimony mirrored many elements of the charged offenses. "[I]f the prior [sexual] offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 285.) In each instance, defendant used his position as a hitting coach to

20

sexually assault the teenage girls he was training. The manner of touching was also similar, with M.R., D.R., and K.S. testifying that defendant touched them under the pretext of stretching or massaging their muscles while training. S.W. similarly testified that defendant touched her inappropriately when purportedly examining her body's athletic ability during a training session.

Nonetheless, defendant argues that with respect to similarities between the charged and uncharged acts, M.R.'s testimony that defendant repeatedly raped her was dissimilar to, and far worse than, the charged acts. He therefore contends that the prejudicial effect of her "inflammatory" testimony outweighed any potential probative value.[4] In order for a "substantial danger of undue prejudice" to "substantially outweigh[]" the probative value of the evidence (Evid. Code, § 352), the evidence must " 'uniquely tend[] to evoke an emotional bias against defendant as an individual and [have] very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)

Here, M.R.'s testimony mirrored H.L.'s testimony in many ways. Both sexual assaults occurred overnight in the bedrooms where the girls slept, during extended periods of coaching. Defendant touched both of their vaginas while stretching them. He also penetrated both H.L.'s and M.R.'s vaginas, with his finger (both H.L. and M.R.) and with his penis (M.R.). We do not dispute that defendant's rapes of M.R. were objectively more egregious than the charged crimes, in that they occurred numerous times and caused M.R. physical pain and injury. However, we still cannot say the prejudicial impact of

---

**4**    Defense counsel adequately preserved this issue for appeal. She specifically objected to admitting M.R.'s testimony of the uncharged rapes and, in doing so, expressly referenced her brief arguing that evidence of uncharged acts is inadmissible under Evidence Code sections 352 and 1108. Thus, we need not consider defendant's alternative ineffective assistance of counsel argument.

M.R.'s testimony *substantially* outweighed its probative effect. Indeed, M.R.'s testimony was unlikely to evoke meaningful emotional bias against defendant given the similarities between the charged and uncharged crimes. We disagree with defendant's suggestion that the jury would be undisturbed by H.L.'s and M.R.'s testimony of the charged sexual assaults, which included forcible penetration and oral copulation of a teenager in her bedroom, but feel troubled to learn that defendant may have had forcible sex with a teenager in his house. (See, e.g., *People v. Ennis* (2010) 190 Cal.App.4th 721, 734 [no substantial prejudice where uncharged crime also involved molestation, but of a younger and disabled child].) The trial court further lessened the risk of the jury feeling a visceral, and therefore potentially biased, emotional reaction to M.R.'s testimony by excluding use of the term "rape." As a result, admission of M.R.'s testimony was not unduly prejudicial.

Further, contrary to defendant's contention, the uncharged incidents were not so remote in time that their admission was an abuse of discretion. Three of the witnesses described acts occurring within one to three years of the charged offenses. The fourth, D.R., attested to incidents from 2007 or 2008. However, her description of how defendant would touch her inappropriately while stretching, and make sexually graphic comments to her, closely resembled H.L.'s testimony of defendant's acts. (See *People v. Branch, supra*, 91 Cal.App.4th at p. 285 ["significant similarities between the prior and the charged offenses may 'balance[] out the remoteness' "].) Accordingly, the trial court was within its discretion to permit D.R.'s testimony, despite several years having passed since the events. Additionally, the testimony did not unduly consume time, as each witness was asked about her relationship with defendant and to provide a description of defendant's uncharged acts. Indeed, the trial court took care to only admit some, but not all, of the uncharged acts, to ensure that the testimony did not use excessive time at trial.

There is also little likelihood of jury confusion from the uncharged acts. "Jurors are presumed able to understand and correlate instructions and are further presumed to

have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Here, the jury was instructed with CALCRIM No. 1191A, which listed the uncharged crimes and explained that the jury was permitted to consider them, if proven, as evidence that defendant was disposed or inclined to commit sexual offenses. It further explained that the evidence was not sufficient by itself to prove defendant was guilty in this case. Thus, the jury was well apprised as to how to use the evidence, if it so chose. Moreover, these instructions, which advised the jury of the limited purpose for which it could consider evidence of the uncharged crimes, "counterbalanced" any risk that the jury would be tempted to punish defendant for the uncharged acts. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42 [risk that jury would punish the defendant for uncharged crimes counterbalanced by jury instructions]; see also *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1103 [jury instruction on limited purpose of evidence of uncharged acts reduced possibility of jury confusion].) Thus, the trial court was within its discretion to find that the risk of jury confusion, if any, did not render the evidence inadmissible.

Accordingly, we find no error in the trial court's admission of this evidence.[5]

## III

### *CSAAS*

Next, defendant argues that the trial court abused its discretion by admitting, over defendant's objection, Dr. Carmichael's expert testimony on CSAAS. Defendant admits that California courts have permitted use of CSAAS evidence for limited purposes, but argues it was inadmissible here for multiple reasons. Consequently, defendant avers that

---

[5] We note that the jury instructions reflect that the trial court also admitted evidence of the uncharged acts under Evidence Code section 1101, subdivision (b) as evidence of defendant's intent, that defendant's actions were not the result of mistake or accident, and/or that defendant had a plan or scheme to commit the charged offenses. As defendant does not argue that the evidence was inadmissible under this section, but solely focuses on its admissibility as propensity evidence under Evidence Code section 1108, we do not express an opinion as to its admissibility under Evidence Code section 1101.

Dr. Carmichael's "irrelevant and inflammatory" testimony denied defendant a fair trial and reversal is required. We find no abuse of discretion.

A. *Legal standard*

Expert opinion testimony is admissible when the subject matter is "beyond common experience," and the opinion would assist the jury. (Evid. Code, § 801, subd. (a).) An expert opinion may be provided at trial even if the jurors have some knowledge of the topic, as long as the testimony would assist the jury. (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 [an expert may testify on a subject about which jurors are not " 'wholly ignorant' "].) We review the trial court's decision to admit expert testimony for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

B. *Analysis*

Defendant first argues that the CSAAS evidence was subject to exclusion because it fails to satisfy the *Kelly-Frye*[6] framework for the admission of scientific evidence. While defendant acknowledges that California courts have found CSAAS evidence admissible in certain circumstances, he contends that CSAAS evidence is now outdated, unscientific, and no longer necessary to disabuse misconceptions about child sexual abuse.

In *People v. McAlpin* (1991) 53 Cal.3d 1289, our Supreme Court recognized that that CSAAS testimony has been found admissible as a means to " 'disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id*. at p. 1301.) It explained that CSAAS evidence is not admissible to prove the complaining witness has been abused, but rather to rehabilitate credibility when the defense suggests a child's conduct after an incident is inconsistent with abuse. (*Id*. at p. 1300.)

_____

[6] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. U.S.* (D.C. Cir. 1923) 293 F. 1013.

24

The Supreme Court later cited *McAlpin* with approval, extending its analysis to expert testimony on the common behaviors of victims of domestic violence. (*People v. Brown* (2004) 33 Cal.4th 892, 906.) And, Courts of Appeal have consistently followed *McAlpin* and *Brown* in holding CSAAS testimony is admissible for the purposes stated in *McAlpin*. (See, e.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 468; *People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*); *People v. Perez* (2010) 182 Cal.App.4th 231, 245.) While defendant urges us to reconsider Supreme Court precedent based on out-of-state decisions and news articles, we cannot rely on these authorities over our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Further, Dr. Carmichael's CSAAS testimony was not required to meet the *Kelly-Frye* standard for admissibility. *Kelly-Frye* "renders inadmissible evidence derived from a 'new scientific technique' unless the proponent shows [among other things] that . . . 'the technique is generally accepted as reliable in the relevant scientific community.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 315.) However, it is only when CSAAS evidence is offered as evidence of defendant's guilt, or as a predictive tool, that courts have excluded the evidence as incompatible with *Kelly-Frye*. (See, e.g., *People v. Bowker* (1988) 203 Cal.App.3d 385, 389-395.) Where, as here, CSAAS evidence is offered for the limited purpose of rehabilitating witness credibility and explaining a victim's reactions to abuse, courts have consistently found that the *Kelly-Frye* reliability standard does not apply because the testimony does not concern a new scientific method of proving that molestation had occurred. (See, e.g., *People v. Wells* (2004) 118 Cal.App.4th 179, 187-190; *People v. Gray* (1986) 187 Cal.App.3d 213, 218-219.)

Next, relying on multiple prospective jurors' statements at voir dire, defendant contends the CSAAS testimony was irrelevant because the jury did not harbor misconceptions about delay and inconsistent reporting. However, the jurors' statements during voir dire do not reflect that the jury had a comprehensive understanding of child abuse reporting. At best, several jurors touched upon some of the CSAAS factors, saying

25

victims may not come forward because, for example, "there are emotions involved . . . shame [and] fear," "the situation could be difficult and [the child] could be scared," or "there's a lot of pressure not to report . . . sometimes, it just takes a while to process it." And many of the jurors simply referred to a delay as "normal," "understandable," or "not unusual." Thus, while some jury members generally understood that a child might have reasons to delay reporting, their responses did not reveal that they were fully aware of all the relevant dynamics of child sexual abuse reporting. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 172-173 (*Lapenias*) [rejecting a similar claim when the record does not establish that all the empaneled jurors were aware of the entire spectrum of CSAAS evidence].) Dr. Carmichael's testimony was relevant to fill in those gaps in the jury's knowledge.[7]

Finally, defendant contends that the statistical probability evidence Dr. Carmichael presented invaded the province of the jury. He argues that the statistics invited jurors to presume defendant's guilt based on probabilities, rather than properly assessing the evidence. In support, defendant references the following assertions that Dr. Carmichael made at trial: research found that about 70 percent of victims showed no outward sign of distress; upwards of 60 to 70 percent of victims delayed disclosure of the abuse in the first year; children can be inconsistent in their disclosures; a "sizable minority" of alleged victims will later recant and say it did not happen; some research shows that younger children might be more inclined to recant; and false allegations of child sexual abuse "mostly" arise in custody cases.

---

[7] Defendant makes the related assertion that Dr. Carmichael's testimony was irrelevant because the public is now generally more educated on children's responses to sexual abuse. However, even if, as defendant contends, the public might be more aware of these issues, this does not mean there are no longer any misconceptions about how children react to and report sexual abuse. Further, even assuming the jury or public was fully aware of the specifics of CSAAS, Dr. Carmichael's testimony would be "merely cumulative and therefore not prejudicial." (*Lapenias, supra*, 67 Cal.App.5th at p. 173.)

Defendant insists that this probability evidence was inadmissible under *Julian, supra*, 34 Cal.App.5th 878; *People v. Wilson* (2019) 33 Cal.App.5th 559; and *Lapenias, supra*, 67 Cal.App.5th 162. We find these cases distinguishable. In both *Julian* and *Wilson*, the same expert testified that there were "a 'dozen studies' that supported a 'one to six percent' false allegation rate," and that false allegations of child sexual abuse happen " 'very infrequently' " or " 'rarely.' " (*Julian*, at pp. 883-884; *Wilson, supra*, at p. 568 [same expert with the same testimony].) Both cases held it was an abuse of discretion for a court to permit an expert on child sexual abuse to testify about the statistical percentages of false allegations by child sexual abuse victims. (*Julian*, at pp. 886-887; *Wilson*, at pp. 570-571.) In doing so, they relied on cases from various jurisdictions which held that permitting an expert to quantify the percentage of abuse victims who tell the truth deprives the jury of its right and ability to determine victim credibility. (*Julian*, at pp. 886-887; *Wilson*, at pp. 569-571.) As explained in *People v. Bowker, supra*, 203 Cal.App.3d 385, cited in *Julian*, "It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested. It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused. The former may be appropriate in some circumstances; the latter . . . clearly is not." (*Id.* at p. 393.) *Lapenias*, in turn, relied on *Julian* and *Wilson* to hold that the trial court erred by admitting expert testimony that it was " 'rare' for children to make false allegations of sexual abuse." (*Lapenias*, at p. 179; *id.* at p. 178.)

Dr. Carmichael's testimony is unlike the testimony found inadmissible in *Julian*, *Wilson*, and *Lapenias*. Here. Dr. Carmichael did not testify as to the probability that an alleged victim would make false allegations of sexual abuse. Indeed, he did not present any qualitative or quantitative data from which the jury could infer that it was overwhelmingly likely the victims and witnesses were being truthful. Rather, his testimony addressed the misconception that children will immediately report abuse after

27

it occurs, and that those children will tell consistent versions and have no reason to recant truthful testimony. Such testimony has been deemed admissible. (See e.g., *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117 [CSAAS expert testimony admissible to explain victim's delayed reporting and inconsistencies in victim's testimony]; *People v. Housley* (1992) 6 Cal.App.4th 947, 954-956 [expert testimony that "victims commonly and falsely recant their stories of abuse" admissible].) And while Dr. Carmichael did reference statistics or otherwise make qualitative remarks regarding the likelihood of delayed disclosure, visible signs of distress, and the increased likelihood of false allegations in custody cases, he did so simply to inform the jury that the behavior of sexually abused children he described was typical. (See *Lapenias, supra*, 67 Cal.App.5th at p. 179.) His testimony did not improperly weigh in on victim credibility, nor did it suggest that any child who met his criteria had been abused.

Accordingly, the trial court did not abuse its discretion by admitting Dr. Carmichael's testimony. As we find no error, we reject defendant's contention that the admission of CSAAS evidence violated his right to due process and a fair trial.

IV

*Motion for New Trial*

Defendant next avers that the trial court erroneously denied his motion for new trial, which was predicated on newly discovered evidence. We disagree.

A.    *Additional procedural background*

Following the jury verdict and sentencing, defendant moved for a new trial based on newly discovered medical records from a medical examination of M.R. that took place in December 2018, over a month after defendant allegedly raped M.R. The People discovered the evidence in December 2020, when M.R.'s mother told them that M.R. had a " 'rape exam,' " which she then clarified was a doctor's visit through private insurance to check M.R. for sexually transmitted diseases (STD's). Defendant argued that the medical records would have impeached M.R.'s credibility, because they did not contain

28

corroborating findings of sexual assault, such that a different result on retrial was reasonably probable.

The trial court denied the motion, finding that, if anything, the medical records corroborated M.R.'s testimony, the exam could not be described as a "rape exam," and the exam was not particularly probative given the alleged rape occurred weeks prior. Accordingly, the trial court found that the information would not have benefited defendant at trial, and that it was therefore not reasonably probable that it would result in a different outcome at trial.

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.] [¶] In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

B.    *Analysis*

While there is no doubt that M.R.'s medical records were newly discovered following trial, the trial court was within its discretion to find that it is not reasonably probable that the introduction of this evidence would result in a different outcome at retrial. Defendant contends that the records would cast doubt on M.R.'s credibility, who was both a key witness and a victim, because they did not reveal physical evidence of sexual abuse. Further, defendant suggests that M.R. concealed the records due to a possible "hidden agenda." However, the records were wholly consistent with M.R.'s

29

testimony. They showed that M.R. reported "'sexual abuse early Nov[ember]'" occurring in Arizona, that her parents requested STD testing as a result, and that M.R. denied a rectal assault. A February 2019 progress note also states that M.R. was in therapy for posttraumatic stress syndrome and was experiencing "increasing depressed mood, anxiety, panic attacks," which is generally consistent with M.R.'s statements at trial.

Moreover, while the record does not contain physical evidence of sexual assault, the lack of such evidence has no bearing on whether M.R. was actually sexually assaulted. Indeed, the records are not from a forensic rape exam, but rather from a doctor's exam through M.R.'s private insurance, which took place weeks after defendant allegedly raped M.R. And, the fact that no STD's were found does not impeach M.R.'s testimony. Thus, the trial court did not err by finding that it was not reasonably probable that the medical records, which are consistent with M.R.'s testimony to the extent they have any probative value, would render a different result at trial.

V

*Resentencing*

Finally, defendant contends he is entitled to remand for resentencing in light of two recent changes to the law that went into effect while his appeal was pending and apply retroactively. Defendant first argues that the trial court must now impose his sentences for counts 1, 2, and 4 consistent with the requirements of Senate Bill 567. He further argues that Assembly Bill 518 grants the trial court new discretion to determine which count to stay under section 654, and that resentencing is required on this basis as well. The People concede the latter point, and further assert that on remand, the trial court can address all of defendant's sentencing claims. We accept the People's concession and agree that remand for resentencing is required.

A.    *Assembly Bill 518*

At the time defendant was sentenced, former section 654, subdivision (a) provided: "An act or omission that is punishable in different ways by different provisions

30

of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Stats. 1997, ch. 410, § 1.) Assembly Bill 518 amended section 654 to allow trial courts to exercise discretion in choosing the count for which it will impose punishment, rather than requiring imposition of the longest potential term of imprisonment. (Stats. 2021, ch. 441, § 1.) Section 654, subdivision (a) now provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions . . . ."

Here, the trial court applied section 654 to stay the sentence on count 1, as it lacked discretion to apply section 654 to any other term. Because the trial court now has discretion to choose the term to which section 654 applies, and defendant's case is not yet final, he is entitled to the benefits of amended section 654 pursuant to the principles of retroactivity established in *In re Estrada* (1965) 63 Cal.2d 740. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) Accordingly, we shall remand for the trial court to exercise its discretion in deciding which terms to stay pursuant to section 654 as amended.

B.     *Senate Bill 567*

Defendant further contends that he should be resentenced under Senate Bill 567. (Stats. 2021, ch. 731, § 1.3.) Senate Bill 567 requires that the trial court impose a term of imprisonment not exceeding the middle term unless (1) aggravating circumstances have been established by stipulation or found true beyond a reasonable doubt at trial, or (2) the defendant has suffered prior convictions as established by certified records. (§ 1170, subd. (b).) The new law generally allows for a bifurcated trial on these aggravating circumstances. (§ 1170, subd. (b)(2).) Due to the People's acknowledgement that remand is appropriate to resentence defendant pursuant to Assembly Bill 518, they declined to address the application of Senate Bill 567 to defendant's sentence.

31

We also need not address the applicability of Senate Bill 567 at this time. On remand, the trial court will have the opportunity to apply section 1170, subdivision (b), as amended, to impose the appropriate sentence.

DISPOSITION

The sentence is vacated, and the case is remanded to the trial court to exercise its discretion in deciding which terms to stay pursuant to section 654 (as amended by Stats. 2021, ch. 441, § 1), and to impose terms of imprisonment consistent with section 1170, subdivision (b) (as amended by Stats. 2021, ch. 731, § 1.3), to the extent applicable. If the court imposes a different sentence than that imposed at the initial sentencing, it is directed to prepare an amended abstract of judgment and to forward a certified copy thereof to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


                    KRAUSE    , J.


We concur:


   DUARTE   , Acting P. J.


   McADAM   , J.[*]


---

[*] Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.